IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

NIELSEN V. AMMC

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

PHYLLIS NIELSEN, APPELLANT,

V.

AMMC, INC., DOING BUSINESS AS MORRISSEY MOTOR COMPANY AND ITS WORKERS'
COMPENSATION INSURER, ACCIDENT FUND INSURANCE COMPANY OF AMERICA, APPELLEES.

Filed March 19, 2024.    No. A-23-548.

Appeal from the Nebraska Workers' Compensation Court: JAMES R. COE, Judge. Affirmed.

Jon Rehm, of Rehm, Moore & Rehm, P.C., L.L.O., for appellant.

Kathryn L. Hartnett, of Prentiss Grant, L.L.C., for appellees.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

PIRTLE, Chief Judge.

INTRODUCTION

Phyllis Nielsen filed a petition in the Nebraska Workers' Compensation Court seeking an award of benefits for injuries that occurred during her employment with AMMC, Inc., doing business as Morrissey Motor Company (Morrissey Motor). Following trial, the compensation court awarded Nielsen temporary total disability benefits for 13 2/7 weeks and ordered Morrissey Motor to pay outstanding medical expenses, mileage expenses, and pharmacy expenses. Nielsen appeals the court's award, claiming the court should have awarded her permanent partial disability (PPD) benefits and future medical expenses. Based on the reasons that follow, we affirm.

- 1 -

BACKGROUND

On February 5, 2015, Nielsen was employed by Morrissey Motor as a car salesperson, and while so employed and while engaged in the duties of her employment, she was injured when she slipped and fell on ice while moving vehicles in the parking lot.

On March 20, 2017, Nielsen filed an amended petition in the compensation court seeking compensation for injuries sustained in the course of her employment with Morrissey Motor on February 5, 2015.

Trial was held on April 19, 2023. The parties stipulated that Nielsen sustained an injury arising out of and in the course of her employment on February 5, 2015. Specifically, Nielsen injured her left arm, ribs, neck, mid-back, low-back, right foot, and body as a whole. Morrissey Motor accepted compensability for these injuries and stipulated that Nielsen was temporarily totally disabled from May 18, 2017, to June 19, 2017, and March 27, 2018, to May 25, 2018. The two periods totaled 13 weeks and 2 days. The parties also stipulated Nielsen's average weekly wage. They further stipulated that Morrissey Motor would pay all reasonable and necessary medical bills as set forth in a medical bill summary.

At trial, Nielsen was the only witness to testify, but numerous medical records were entered into evidence. The evidence showed that on February 6, 2015, the day after the accident, Nielsen sought chiropractic treatment from Dr. Shannon Spence for neck and back pain. He performed spinal adjustments due to cervical, thoracic, lumbosacral, sacroiliac ligament, and lumbar sprains/strains. A couple weeks after the slip and fall, she reported pain in her right ankle. She continued receiving chiropractic care off and on through July 2016, later treating with a different chiropractor.

On February 24, 2015, Nielsen went to a medical clinic due to right ankle pain. X-rays were taken and Nielsen was placed in an ambulatory walking boot.

In late March 2015, Nielsen saw Dr. Robert Colligan, a podiatrist, for right ankle pain. He reviewed the x-rays taken at the medical clinic and further ordered an MRI of Nielsen's right ankle. He identified a hard prominence on Nielsen's lateral right ankle. Colligan ultimately referred Nielsen to Dr. James Bertus, a pain management specialist.

Nielsen saw Bertus on April 6, 2015. His assessment stated that he "would consider the diagnosis of complex regional pain syndrome [CRPS]." On April 16, he performed a "right paravertebral sympathetic lumber block" for the CRPS in the right ankle. A second lumbar block was done on May 8. Bertus had no consistent follow-up with Nielsen until February 2017, when Nielsen returned to his office due to right foot, ankle, and leg pain. Bertus told her she might be experiencing a return of her CRPS or peripheral neuropathic pain or lumbar sacral radicular pain. He recommended a repeated right paravertebral sympathetic lumber block, as well as physical therapy and an appointment with a podiatrist.

In September 2015 Nielsen began seeing Dr. Ralph Reeder for neck and back pain. In September 2015 he ordered an MRI of her neck and back, which took place in November. Following the MRI, Reeder referred her to a pain management clinic, and suggested "left C2-3, C3-4 facet injections and consideration of rhizotomy at the same levels." He also thought she may be a candidate for trigger point injections and occipital nerve block to help with her pain.

In December 2015, Dr. Wade Lukken performed cervical facet injections for Nielsen's neck pain and headaches. In a medical note dated January 31, 2017, Lukken opined that Nielsen's pain in her neck, shoulder, and back, and her headaches were caused by her fall on February 5, 2015. He deferred the causation question to another doctor regarding her right lower extremity and CRPS. He also indicated that Nielsen had not reached maximum medical improvement (MMI) as a result of the accident-related injuries, noting that future treatment had been stopped because Nielsen was unable to pay for procedures. Lukken further indicated that she will more than likely need future medical care to treat the accident-related injuries but did not identify what care may be required in the future. There are no treatment records for Nielsen's back and/or neck after June 2017.

On May 18, 2017, Dr. Demetrio Aguila and Dr. Jason R. Bailey performed surgery on Nielsen's right ankle in which they excised a neuroma on her right sural nerve and repaired the sural nerve to help relieve the CRPS and neuropathy of her right lower extremity. She was told she could return to work without restrictions on June 19, 2017. In August 2020, Aguila performed a second surgery on Nielsen's right foot that involved revision of the "tarsal tunnel" and "decompression of the right tibial nerve proximally."

On April 17, 2018, Dr. Robert Prince, a pain management specialist, implanted a spinal cord stimulator in Nielsen's spine to reduce the pain in her right foot. Prince issued a 10-pound lifting restriction and a no bending or twisting restriction effective until May 29. There were no permanent restrictions from Prince after May 29.

In May 2019 and July 2021, Prince performed a procedure to replace the leads in the spinal cord stimulator that had become displaced.

In December 2021, Nielsen transitioned her care for her CRSP from Prince to Dr. Grant Shumaker. Nielsen continued to have problems with the stimulator and in February 2022, Shumaker surgically implanted an electrode as part of the stimulator. Shumaker released Nielsen to return to work on March 22 without any restrictions.

The evidence contains various medical opinions regarding Nielsen's work accident and resulting injuries. In a medical report from Bertus dated June 1, 2017, he indicated that it was his opinion that Nielsen's right lower extremity and right ankle pain and CRPS were more likely than not caused by her fall on February 5, 2015. He further indicated that he was unable to determine if Nielsen had reached MMI and, therefore, did not answer what degree of permanent impairment Nielsen had, if any, or whether he would recommend a functional capacity evaluation. He further indicated that he was unable to determine if Nielsen would have future medical needs.

A defense medical examination of Nielsen was performed by Dr. Dean Wampler. In his report dated November 20, 2017, and notwithstanding the parties' stipulation regarding causation, Wampler stated that the only injuries he could conclusively link to the February 5, 2015, slip and fall were limited to the initial complaints of neck, shoulder, and low back strains. Wampler stated he could not causally connect Nielsen's right foot and right ankle pain with an ultimate diagnosis of sural neuroma to the events of February 5. Wampler explained that a non-traumatic neuroma typically starts gradually and gets worse over time. When a peripheral neuroma of any type is associated with acute trauma, the pain is immediate and typically intense, and that was not the case with Nielsen. He stated that her theory does not match the medical principles of acute nerve injury.

Wampler further stated that he could not attribute the right foot and ankle treatments by Colligan and Bertus to the February 5 accident.

Wampler opined that Nielsen reached MMI on August 9, 2015. Regarding permanent partial impairment, Wampler stated that all conditions related to the work injury, i.e., Nielsen's left shoulder/arm contusion and cervical strain with temporary exacerbation of lumbar degenerative disease, have resolved and have zero percent partial impairment. He further stated that no permanent restrictions were necessary as a result of the work injury, and no future medical treatment was necessary.

Wampler authored two supplemental reports. The first supplemental report was prepared in March 2019 and Wampler stated that he could not connect her current foot and ankle complaints, nor the sural neuroma, to the February 2015 fall. He stated he did not assign a MMI date for any extremity complaints because they were not causally connected to her fall. Regarding Nielsen's neck and back injuries, Wampler again stated that she reached MMI on August 9, 2015, he assigned a zero percent impairment rating, and stated that no permanent restrictions were required.

The second supplemental report was prepared on August 1, 2019. Wampler noted that Nielsen's treatment since February 5, 2015, has evolved from initial neck, shoulder, and hip pain into pursuit of right foot and ankle pain. She was diagnosed with CRPS by Bertus and later evaluated by Aguila, who found a previously noticed hard spot on her ankle which he diagnosed as a sural neuroma and performed surgery to excise it. Her foot pain subsequently returned, and she had a stimulator implanted sometime in 2018. Wampler stated that Nielsen was demonstrating pain behavior that was inconsistent with her diagnosis. His opinions regarding MMI, impairment rating, and permanent physical restrictions remained the same as in his two previous reports.

In July 2020, Ted Stricklett, a vocational rehabilitation expert, conducted a loss of earning capacity analysis regarding Nielsen. Stricklett stated in his report that the only medical documents in his possession that discussed permanent physical restrictions are from Wampler, and he found in his reports no permanent physical restrictions attributable to Nielsen's February 5, 2015, slip and fall injuries. Stricklett concluded that if consideration is given to the opinion of Wampler, then Nielson's loss of earning capacity is zero percent. Stricklett asked the parties to forward any permanent physical restrictions that have been identified by Prince or any other provider so that he could perform a supplemental loss of earning capacity analysis report. There is no supplemental analysis in the record.

The evidence also contains a medical report from Bailey recounting his visit with Nielsen on February 6, 2023. He stated that Nielsen was still suffering from pain in her lower right extremity due to her CRPS, tarsal tunnel syndrome, and plantar fasciitis in her right foot. He noted that Nielsen was receiving treatment for her pain management with Prince and receiving pain medication to help with the pain. Bailey opined that Nielsen had reached MMI. He noted that he would continue to see her on an "as needed" basis and she would continue with pain management. He concluded that "[t]his will be a chronic disabling condition for the patient."

On February 14, 2023, Nielsen underwent a functional capacity evaluation (FCE). The results showed she could work in a light physical demand level job and that was the same occupational physical demand level of her employment at the time she was injured. Nielsen's description of her job's demands included frequent standing, frequent walking, frequent sitting, fine manipulation, and an ability to lift 10 pounds. The FCE results showed that Nielsen could lift

from 12 to 17 pounds, sit for 6 hours, stand for 1 hour, walk for 1 to 2 hours, and use her upper extremities for 7 hours. Nielsen had continued to work full-time at a different car dealership.

The compensation court entered its award on June 22, 2023. It awarded Nielsen payment for outstanding medical expenses, credit against the payment of any medical expenses in the amount of $107,523.60, mileage and pharmacy expenses, and payment for temporary total disability in the amount of $554.24 per week for 13 2/7 weeks.

## ASSIGNMENTS OF ERROR

Restated, Nielsen assigns that the compensation court erred in failing to award her (1) future medical expenses and (2) permanent partial disability benefits beginning February 5, 2015, as well as additional temporary disability benefits.

## STANDARD OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019).

An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id.* Findings of fact made by the compensation court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Id.*

As the trier of fact, the compensation court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.*

## ANALYSIS

*Future Medical Expenses.*

Nielsen first assigns that the court erred in failing to award her future medical expenses. She argues there was evidence presented from medical professionals indicating she will need routine maintenance and replacements for the spinal cord stimulator, and she will have a need for long-term opioid use requiring ongoing consultations.

Regarding the spinal cord simulator, Nielsen relies on a medical report completed by Prince in May 2019. In the report he states that Nielsen was scheduled to have "a revision of a spinal cord stimulating lead that backed out. Once that is replaced I believe that she will reach MMI. The [implantable pulse generator] will have to be replaced about every 5 years." The statement by Prince is the only evidence of future medical treatment. Wampler stated in his report dated November 20, 2017, that no future medical treatment was necessary. Although the report was prepared before the stimulator was implanted in April 2018, Wampler authored two supplemental reports after Nielsen had the stimulator and never indicated that his opinion regarding future medical care had changed.

Regarding Nielsen's ongoing use of opioids for pain, she argues that "the end of nearly every medical report submitted, in [Prince's notes] and more, identifies [Nielsen's] medically

necessary opioid use. Patients are, of course, required to attend regular consultations in order to receive long-term use." Brief for appellant at 6. The medical notes that she refers to indicate "long term prescription opiate use" or something similar under "Assessment/Plan." However, there is no explicit statement by a physician that such future use of opioids will be required, or that any other future treatment is medically necessary.

The compensation court declined to award future medical expenses, concluding that Nielsen failed to meet her burden of proof as set forth in *Adams v. Cargill Meat Solutions*, 17 Neb. App 708, 774 N.W.2d 761 (2009). Specifically, it stated:

> The Court can find no statement regarding future medical care that supports the requirements found in the case of [*Adams v. Cargill Meat Solutions, supra,*] which stated an award of future medical requires explicit evidence that future medical treatment is reasonably necessary to relieve the injured worker from the effects of the worker[']s injury. A review of the medical evidence before the Court shows that there is no explicit statement by a physician that future treatment is reasonably necessary to relieve the injured worker from the effects of the work injury.

We determine the compensation court did not err in failing to award future medical expenses. Before an order for future medical benefits may be entered, there should be a stipulation of the parties or evidence in the record to support a determination that future medical treatment will be reasonably necessary to relieve the injured worker from the effects of the work-related injury or occupational disease. *Bower v. Eaton Corp.*, 301 Neb. 311, 918 N.W.2d 249 (2018). An award of future medical expenses requires explicit evidence that future medical treatment is reasonably necessary to relieve the injured worker from the effects of the work-related injury. See, *id.*; *Adams v. Cargill Meat Solutions, supra*. As the compensation court found, the record does not contain an explicit statement by a physician that future treatment is reasonably necessary to relieve Nielsen from the effects of the work injury. We agree that Nielsen failed to meet her burden of proof for future medical care.

Nielsen's first assignment of error fails.

*PPD Benefits.*

Nielsen next assigns that the compensation court erred in failing to award her PPD benefits, as well as additional temporary disability benefits. We first note that although her assignment of error includes the allegation that the court erred in failing to award her additional temporary disability benefits, she does not argue that error in her appellate brief. In order to be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). Because Nielsen has failed to assign and argue the court's failure to award additional temporary disability benefits, we need not address it further.

Accordingly, we only address Nielsen's assignment that the compensation court erred in failing to award her PPD benefits. The court found that Nielsen was not entitled to PPD benefits because she failed to present a statement by a physician that she had a permanent physical impairment or permanent restrictions as required by *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197,

639 N.W.2d 94 (2002). It further found that because there was no evidence to support a permanent disability, Nielsen sustained no loss of earning capacity.

While the claimant has the burden to prove by a preponderance of the evidence that his or her employment proximately caused the injury which resulted in a compensable disability, the issue of causation of injury or disability is one for determination of the trier of fact. *Id.* Along with causation, the issue of whether the claimant has sustained a permanent impairment, and the extent of impairment, are questions of fact. *Id.* In testing the sufficiency of the evidence to support the findings of fact, the evidence must be considered in the light most favorable to the successful party. *Id.*

The term "impairment" is a medical assessment, while the term "disability" is a legal issue. *Id.* Permanent medical impairment is related directly to the health status of the individual, whereas disability can be determined only within the context of the personal, social, or occupational demands, or statutory or regulatory requirements that the individual is unable to meet as a result of the impairment. *Id.*

In *Green v. Drivers Mgmt., Inc., supra*, the Nebraska Supreme Court held that before PPD benefits can be awarded, the claimant must prove that he or she has a permanent impairment. The court further stated that "[w]ithout a finding of permanent medical impairment, there can be no permanent restrictions. Without impairment or restrictions, there can be no disability or labor market access loss." *Id.* at 206, 639 N.W.2d at 103. See also *Swanson v. Park Place Automotive*, 267 Neb. 133, 672 N.W.2d 405 (2003).

Nielsen argues that there is evidence that permanent restrictions were ordered as recently as February 2023. She relies on the FCE dated February 14, 2023, which she claims details her physical abilities and work restrictions. The FCE report was prepared by the physical therapists who conducted the assessment and contains the results of the testing Nielsen completed. The results showed that she could work in a light physical demand level job which was the same occupational physical demand level as her employment at the time she was injured. Nielsen's description of her job's demands included frequent standing, frequent walking, frequent sitting, fine manipulation, and an ability to lift 10 pounds. The FCE results showed that Nielsen could lift from 12 to 17 pounds, sit for 6 hours, stand for 1 hour, walk for 1 to 2 hours, and use her upper extremities for 7 hours. The exhibit does not contain any permanent restrictions or indicate any permanent impairment.

The only evidence regarding permanent impairment or permanent restrictions supports a finding that Nielsen does not have either. Wampler's November 2017 report stated that he could not causally connect Nielsen's current foot and ankle complaints, nor the sural neuroma, to her work accident on February 5, 2015. He further opined that all conditions related to the work injury, i.e., Nielsen's left shoulder/arm contusion and cervical strain with temporary exacerbation of lumbar degenerative disease, have resolved and have zero percent partial impairment. He concluded that no permanent restrictions were necessary as a result of the work injury. His opinions remained the same as of the date of his second supplemental report in August 2019.

In addition, Stricklett, in his July 2020 loss of earning capacity analysis, stated that the only medical documents in his possession that discussed permanent physical restrictions were from Wampler, and he found no permanent physical restrictions attributable to Nielsen's February 5,

2015, slip and fall injuries. Stricklett concluded that if consideration is given to the opinion of Wampler, then Nielson's loss of earning capacity is zero percent.

Finally, in February 2023, Bailey opined that Nielsen had reached MMI and that Nielsen's right lower extremity "will be a chronic disabling condition for the patient." As the compensation court found, Bailey's statement was made regarding a member impairment and not a body as a whole impairment or restriction.

We agree with the compensation court that Nielsen failed to provide evidence of permanent medical impairment or permanent restrictions to the body as a whole and, therefore, there can be no permanent disability. Before permanent partial disability benefits could be awarded to Nielsen, she had to prove that she had a permanent impairment due to her work injury. She failed to prove this, and without proof of a permanent impairment, there can be no permanent restrictions; without impairment or restrictions, there can be no disability. See *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002). Nielsen's second assignment of error fails.

*Additional Argument.*

Nielsen also argues in her appellate brief that the court failed to provide a well-reasoned decision as required by Rule 11 of the Compensation Court Rules of Procedure. However, she did not assign this argument as error and, therefore, we need not address it. See *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

## CONCLUSION

For the reasons set forth above, we affirm the compensation court's award.

AFFIRMED.